GRAND RAPIDS & INDIANA RAILWAY CO. *v.* CITY OF GRAND RAPIDS.

1. RAILROADS — TAXATION — SPECIFIC TAXES — EXEMPTION FROM GENERAL TAXATION.

Under 2 Comp. Laws, § 6277, a parcel of land owned by a railroad and occupied by side tracks and a coal dock belonging to the road, the spaces between the tracks being occasionally and necessarily used for the storage of bulky articles, is "actually used for railroad purposes," and is exempt from general taxation.

2. SAME—LAND OCCUPIED BY INDIVIDUALS.

Lands owned by a railroad, but in possession of private individuals, and used exclusively by them in their individual business for wood and coal yards and sheds and storage of grain, etc., are neither "actually occupied" by the railroad nor "necessary or in use in the proper operation" of the road within section 6277, 2 Comp. Laws, and are therefore properly taxable as other real estate under the general law. GRANT and HOOKER, JJ., dissenting.

3. TAXATION—ASSESSMENT—DESCRIPTION.

A parcel of land described according to a plat, except parts used for the right of way of two named railroads, is sufficiently identified, there being a presumption that the rights of way are matter of record.

4. EQUITY—OFFER TO DO EQUITY.

A landowner, seeking to enjoin the collection of a tax on real estate, cannot prevail on showing that a part of the tract is exempt, though such a showing would be sufficient at law; in order to be entitled to relief in equity he should do equity by paying or offering to pay that portion of the tax justly assessable to the unexempt part.

Appeal from superior court of Grand Rapids; Newnham, J. Submitted January 15, 1904. (Docket No. 37.) Decided October 4, 1904.

Bill by the Grand Rapids & Indiana Railway Company against the city of Grand Rapids and Marcus A. Frost, city treasurer, to enjoin the sale of certain land for the taxes of 1901. From a decree for complainant for a portion of said land, it appeals. Modified.

*T. J. O'Brien* and *James H. Campbell*, for complainant.

*Moses Taggart*, for defendants.

CARPENTER, J. The object of this suit is to enjoin the sale of ten parcels of land for the nonpayment of taxes assessed thereon by the city in 1901. The trial court gave complainant relief as to parcels 8 and 9, but held it liable to pay either all or part of the taxes assessed against the other parcels. Complainant paid the taxes on parcels 4 and 6, and asks this court on this appeal to decree that it is not liable to pay taxes on the other parcels. The principal ground upon which complainant seeks relief is that the parcels of land in question are by law exempt from taxation.

The larger part of parcels 1, 2, 3, 5, and 7 were, by the consent of complainant, in 1901, in the exclusive possession of private individuals, who used the same for their own business. Two wood and coal yards were located on parcel 2, one on parcel 1, one on parcel 7. A wood yard was located on parcel 3, a lumber yard on parcel 5. The

business carried on at these yards by these various private individuals was apparently precisely what it would have been had their location been remote from the railroad. Most, if not all, of the merchandise bought by them came to them by rail over complainant's railroad. Some of that sold by them—though in the case of the wood and coal this appears to have been very little—were shipped away over complainant's railroad. But apparently they sold, and had a right to sell, merchandise to any one who would buy. The estates of these private individuals granted by the railroad company were not in form permanent. The record does not show what rights the owner of the wood yard on parcel 3 had. Complainant gave no express permission for the occupancy of parcel 5 for a lumber yard. But we are bound to decide that that permission was implied. The occupation of parcels 1, 2, and 3 for coal and wood yards was under an express agreement called a "permission and license." The record contains the agreements by which parcels 2 and 7 are occupied. The occupant was to pay no rent; to remove the buildings by him erected, and to vacate the property, in one case in 60 and in the other in 30 days after notice. The occupants of parcel 2 agreed to pay the taxes on the property, if any were assessed. On parcel 1 there was also situated an elevator owned and controlled by the Brown Milling Company. This building was erected under a written permission made in 1888, similar to the writing above described, except that there was no provision for the payment of taxes. The writing specifies that the building "shall be used for the purpose of a grain elevator and warehouse." There is no provision in the writing that the business of a public warehouseman shall be carried on, and there is nothing to indicate that the business that was actually carried on was in any sense a public business. On the contrary, it is to be inferred that the occupant used the same exclusively for storing and shipping the grain purchased or shipped in by itself.

Though the estate of these occupants is called a license,

it was, in a legal sense, more than a license. See *Morrill
v. Mackman*, 24 Mich. 279 (9 Am. Rep. 124). It had
many of the characteristics of an estate at will. See
1 Washburn on Real Property (6th Ed.), §§ 762–796.
While it was terminable at will, it might last for a long
period, and as a matter of fact at the time the assessment
was made parcel 7 had been occupied under the agreement
above described for 19 years.

Parcel 10 was in the form of a parallelogram, 800 feet
in length north and south, and 350 to 400 feet in width
east and west. A short distance from its eastern bound-
ary was a side track. On the western 85 feet of the tract
were four side tracks and a coal dock belonging to com-
plainant. About midway between the tracks on the west-
ern side and the side track on the eastern side was another
track—a stub track—which extended south about 100 feet
from the northern line of this tract. All these side tracks
were used by complainant as occasion demanded. While
it is evident that when the assessor placed this tract upon
the assessment roll he found it vacant, we are neverthe-
less satisfied from the testimony of complainant that the
spaces between these various tracks were occasionally used,
and necessarily used, for the storage of bulky articles; e.
g., railroad material of various kinds and sewer pipe.
This does not mean that every foot of space on this tract
was actually used for storage purposes. The space was
used for that purpose as occasion demanded, and we are
bound to say that such use was occasionally demanded.

Was this property subject to taxation like other real
estate? This depends upon the proper construction of the
following part of section 6277 of the Compiled Laws of
1897:

"The taxes so paid [the specific tax] shall be in lieu of
all other taxes upon the properties of such companies, ex-
cept such real estate as is owned and can be conveyed by
such corporations under the laws of this State, and not
actually occupied in the exercise of its franchises, and not
necessary or in use in the proper operation of its road, but

such real estate so accepted [obviously this should be " excepted"] shall be liable to taxation in the same manner, and for the same purposes, and to the same extent, and subject to the same conditions and limitations as to the collection and return of taxes thereon, as in other real estate in the several townships or municipalities within which the same may be situated."

I agree with my Brothers GRANT and HOOKER that under this section parcel 10 is not liable to general taxation.

Are the other parcels liable to such taxation?

As shown by the foregoing statement, the greater portion of parcels 1, 2, 3, 5, and 7 are, by the consent of complainant, in the exclusive possession of private individuals, and exclusively used by them for their individual business. In the case of the elevator, that business is the purchasing and storing of grain. In the case of the wood and coal yards, that business is the sale of coal and wood. In such business complainant could not lawfully engage. When, by the consent of a railway company, its land is exclusively devoted to a business in which it cannot lawfully engage—a business foreign to the purpose of its organization—such land is not, in my judgment, "actually occupied" by it, and is "not necessary or in use in the proper operation of its road," and is, therefore, under the statute above quoted, taxable "like other real estate in the several townships or municipalities in which the same may be situated."

It is true that there is a relation between complainant's business and the business carried on upon this land. That relation arises from the fact that complainant transported the coal, wood, and lumber sold on these several parcels, and will transport or has transported the grain purchased and stored in the elevator. If this relation affords a ground for exemption, I think we must say that all lands of a railway company used for the storage, purchase, manufacture, or sale of goods which have been or are to be carried by it are exempt from taxation. If so, land of a railway company occupied by a grocery store for the sale

of groceries carried by it, land occupied by a dry goods store for the sale of dry goods carried by it, land occupied by a clothing store for the sale of clothing carried by it, and land occupied by a saloon for the sale of liquors carried by it are all exempt from taxation. And I cannot see why, by the same reasoning, the buildings on said land and the goods stored, purchased, manufactured, or sold thereon are not also exempt. The principle which leads to such consequences cannot, in my judgment, be sound. I think, therefore, that the parts of parcels 1, 2, 3, 5, and 7 which were exclusively in the possession of private individuals, and exclusively used by them for their individual business, were liable to taxation like other real estate. This conclusion is supported by authority.

Under a charter which provided "that no other or further tax or imposition [than the specific tax therein provided] shall be levied or imposed upon the said company," it was held by the supreme court of New Jersey that docks of a railway company leased for lumber yards, for which rent or equivalent compensation was paid, were liable to general taxation. See State v. Newark, 25 N. J. Law, 315. The judgment in that case was affirmed by the court of errors and appeals. See Id., 26 N. J. Law, 519.

Under a similar provision in a charter it was held by the last-named court that property leased by a railway company for a coal yard was liable to general taxation. See Cook v. State, 33 N. J. Law, 474.

It appears from the case last cited that the test of taxability was the profit derived from renting the land. While I do not think this is the test under our statute, which, as already indicated, differs from the New Jersey statute, still, if that test were applied, it would not, in my judgment, help complainant. For while it appears that those who used the land in question paid no rent, it does appear that as a consequence of that occupancy the railway company materially augmented its earnings by carry-

ing their freight. Complainant did, therefore, receive compensation for the occupancy.

The decisions of our own and other States (see *Detroit, etc., Station Co.* v. *City of Detroit,* 88 Mich. 347 [50 N. W. 302]; *Pennsylvania R. Co.* v. *Mayor, etc., of Jersey City,* 49 N. J. Law, 540 [9 Atl. 782, 60 Am. Rep. 648]; *Chicago, etc., R. Co.* v. *Bayfield Co.,* 87 Wis. 188 [58 N. W. 245]) which hold that elevators erected for the purpose of facilitating the loading and unloading of grain carried by railways are not liable to taxation clearly have no application to the land exclusively used by private individuals for the business of conducting coal or wood yards, as appears from the following quotation from the opinion in *Detroit, etc., Station Co.* v. *City of Detroit,* supra:

"This elevator is as essential and necessary to the complainant in the handling of its grain as is its depot for the use of passengers, or its freight depot for the handling of the general merchandise it carries."

Neither do these decisions apply to the land occupied by the Brown elevator. Those decisions are authority for the proposition that elevators which railroad companies are empowered to erect and operate are not liable to general taxation. Railway companies have not, as had the complainant station company in *Detroit, etc., Station Co.* v. *City of Detroit,* supra, any express authority to own and operate an elevator. They undoubtedly do have an implied authority to erect any elevator which enables them to better perform their obligation as common carriers of grain. It is obvious that such elevators—like the elevator in question in *Detroit, etc., Station Co.* v. *City of Detroit,* supra, and in the other cases last cited—afford equal advantages to all shippers. They are not, like the elevator in the case at bar, devoted to the exclusive use of a single person engaged in the business—a business which complainant itself could not carry on—of purchasing and shipping such grain.

137 Mich.—38.

The distinction between the business of running an elevator to facilitate the carriage of grain and of running it as a public warehouse for the storage of grain has been made. See *Milwaukee, etc., R. Co.* v. *City of Milwaukee*, 34 Wis. 271; *In re Swigert*, 119 Ill. 83 (6 N. E. 469). And it is held that the first class of elevators are not liable to taxation, and that the second are. It is apparent that these authorities go much further than it is necessary to go to justify the conclusion that the land occupied by the elevator in question is liable to taxation.

It is contended that our own decision of *Auditor General* v. *Railroad Co.*, 114 Mich. 682 (72 N. W. 992), is opposed to this decision. In that case the auditor general undertook to sell a part of the terminals and depot grounds of the railroad company situated in Bay City. It was held by this court that this could not be done, even though it appeared that two lumber firms "also occupied a part of the docks." I think it may be inferred from the record in that case, as pointed out in the opinion of my Brother HOOKER, that certain portions of the land assessed were in the exclusive occupancy of these lumber firms who used the same for carrying on their individual business of running a lumber yard. The contention that these portions of the land were taxable because they were used exclusively for a business foreign to that of a railway company does not seem to have been presented to the court, or considered by it. And, if it had been, it would not have affected the decision. Had such a contention been made, the court could have answered it by saying the State has no power to sell this entire description of land, most of which is exempt from taxation, because a portion of it is not exempt. See *Osborn* v. *Railroad Co.*, 40 Conn. 498. In my judgment, therefore, *Auditor General* v. *Railroad Co.*, supra, is not opposed to the views stated in this opinion.

It is said that, as the State has once taxed these earnings, it is unjust for it to also tax the land the use of which contributed to augment them. This charge of injustice is

not well founded. It is true that, except for their arrangement with complainant, the lumber dealers and coal dealers who occupied its land would not have shipped their lumber and coal over complainant's road; but either they or other dealers who supplied the city of Grand·Rapids would in that event have shipped it over other railroads. The earnings of railroads liable to State taxation were therefore entirely unaffected by the arrangement between complainant and the occupants of its land. The truth is that complainant, by granting to these lumber and coal dealers a special privilege, viz., the privilege of occupying its land without paying rent, which gives such dealers an advantage over their competitors, has been enabled to obtain the carriage of their freight, which otherwise would have been carried by its competitors. In·other words, the railway company, by giving the lumber and coal dealers an advantage over their·competitors, obtains an advantage over its competitors. If this arrangement is proper, it is beneficial only to the lumber and coal dealers and to complainant. It in no way inures to the benefit of the public, and therefore·does not entitle complainant to any public consideration.

Neither is it true that the arrangement for the occupancy of these parcels of land was beneficial to the city because it resulted in the erection of buildings which are subject to taxation. It must be assumed that, if this arrangement had not been made, these buildings would have been erected in some other part of the city, where they would have also been subjected to taxation. It was, therefore, a matter of indifference to the city where they were erected. Nor would these buildings have escaped taxation if the railroad company had itself erected them. It is true that, if it had used them for some legitimate railway purpose, they would have been exempt; but, if they had been used as these were, it is clear that under the reasoning of this opinion they would not have been. We do not hold these parcels of land liable to taxation simply because of the use to which they are put, but because that use proves that

the land is "not actually occupied" by complainant, and is "not necessary or in use in the proper operation of its road." And the statute (section 6277, 2 Comp. Laws) in express terms makes all land of this description liable to taxation. See *City of St. Paul* v. *Railway Co.*, 39 Minn. 112 (38 N. W. 925); *Milwaukee, etc., R. Co.* v. *City of Milwaukee*, supra.

Complainant, as additional grounds for relief, contends:

(*a*) That the description of the third parcel is fatally defective.

(*b*) The assessment of the first, second, and third parcels is void because included in one description, and under one valuation, are distinct parcels owned by complainant and the Michigan Central Railroad Company.

(*c*) Included in every description are parts which are certainly exempt.

The ground upon which it is claimed that the third description is defective is that there is no means of knowing what is described by this exception: "Also except part used for G. R. & I. and M. C. R. R. Company's right of way." The right of way of the Grand Rapids & Indiana Railway Company is shown by a deed made in 1870 and duly recorded. There is nothing to indicate, and it should not be presumed, that the right of way of the Michigan Central Railroad Company is not also shown by a similar recorded deed. We cannot say, therefore, that the description was not good under our decision in *Harts* v. *City of Mackinac Island*, 131 Mich. 680 (92 N. W. 351).

The other objections, if valid, would prevail if they were asserted in a suit at law or as a defense to a suit to enforce the tax. See *Auditor General* v. *Railroad Co.*, 114 Mich. 682 (72 N. W. 992). But here complainant is seeking relief in a court of equity. Part—the greater part—of these parcels of land is justly liable to taxation. Equitably complainant should pay the proportionate tax justly assessable against such part. It never offered to pay, and now objects to paying, that. Complainant seeks to be relieved from the entire burden of taxation, part of

which, equitably, it ought to bear. It seeks equity, but declines and has declined to do what is equitable. Nor has it presented to us a record which enables us to make any just correction in the decree appealed from—a decree which relieved complainant from the payment of part of the taxes under consideration. Under these circumstances the objections under consideration do not entitle complainant to relief. See *Palmer* v. *Township of Napoleon*, 16 Mich. 176; *Merrill* v. *Auditor General*, 24 Mich. 170; *Conway* v. *Waverly Township Board*, 15 Mich. 257; *Tisdale* v. *Auditor General*, 85 Mich. 261 (48 N. W. 568).

It follows that, in my judgment, complainant is entitled to a decree enjoining the sale of parcel 10, and that the decree appealed from so far as it relates to the other parcels should be affirmed. Complainant will have costs in this court.

MOORE, C. J., and MONTGOMERY, J., concurred with CARPENTER, J.

GRANT, J. (*dissenting*). The object of this bill is to enjoin the sale of ten parcels of land owned by the complainant in the city of Grand Rapids for general city taxes for 1901. The principal claim of the complainant is that these parcels of land were actually occupied in its legitimate business and use, and were exempt from local taxation under 2 Comp. Laws, § 6277. A somewhat full statement is essential to a clear understanding and determination of the question. The southern terminus of the complainant's road is at Richmond, Ind. It extends from that city north through the entire Lower Peninsula of Michigan to Mackinaw City, passing through the defendant city. Grand Rapids is the largest and most important point on the road, which is divided into two divisions; that city being the dividing point and also being the division headquarters. There is a large passenger and freight business in and out of the city. For the purpose of carrying on its business it has obtained considerable

land through the city from the southern to the northern limits. It has a large passenger and two freight depots, a large yard and grounds for delivering and receiving freight along its tracks. In running north its tracks cross Hall street, Fifth, Fourth, Third, Second, and First avenues in the order named. It has extensive railroad shops and a roundhouse located on the west side of the main track between Hall' street and Fifth avenue. Its yard extends from a line south of Hall street to Fifth avenue, and some of the tracks extend north of Fifth avenue. But for the streets intervening, the land involved would be one parcel. Parcel 10 lies south of Fifth avenue, and is about 800 feet north and south and about 350 feet east and west. Immediately at the south of this strip are the roundhouse and construction and repair shops of complainant. Parcel 1 lies between Fifth and Fourth avenues. The south line of this parcel extends from its main track west to Hilton street, thence north 10 rods, thence east 150 feet, and thence north to Fourth avenue, parallel to Hilton street. This line extends as far north as Second avenue, and is the west line of complainant's land, which gradually narrows as it approaches Second avenue. The second parcel lies between Fourth and Third avenues, the third parcel between Third and Second avenues, and the fifth—a strip about 50 feet wide—between Second and First avenues, and is described as the east 50 feet of lots 2, 3, 4, and 5 in block 14. The east boundary line of the above parcels is the west line of the right of way of the main track. The seventh parcel lies about a half mile farther north, and is a strip 70 feet wide, along the east side of Ottawa street between Island and Fulton streets. It is the west 70 feet of lots 2, 4, 6, 8, 10, and 12 on South Ottawa street. It is just north of the train shed and freight house. West of the center line of this block stands the brick freight house fronting on Fulton street. Upon this parcel is a coal yard and a track inside of it. There is only one track within that 70 feet, but there are four tracks on the same lots adjoining. They are used for

delivering coal, and for reaching the freight house, and in loading and unloading cars at the freight house. At the north end these tracks connect with the main track at Market street. The coal shed covers a space of about 40 by 125 feet on the southwest corner of the 70 feet. The rest of the lot is a coal yard. That company uses all of the west 70 feet of these six lots that is not occupied by the railroad company. All the coal that comes to them is brought over the Grand Rapids & Indiana tracks. There is a driveway 12 to 15 feet wide along the west side of the track from which the Bennett Company unloads and loads its freight. This driveway is used by others if occasion requires. The above are the only descriptions now in dispute.

Complainant's coal docks are situated on the west side of the tenth parcel. These docks are used exclusively for its own use in storing coal and coaling engines. The cars are run upon a trestle for dumping into the coal bunkers. There are in all seven tracks upon this parcel—one upon the east, called the "caboose track," used for storing cabooses and sometimes other cars, and a track called the "Porter track," running from the north about 200 feet south of Fifth avenue, used for loading and unloading cars. Teams drive there for the purpose of loading and unloading. Coal, wood, and lumber are unloaded there, and cars are loaded for shipment out. The space between the east and west tracks is used for depositing material such as is required for use in its shops. This parcel of land, or the greater portion of it, was assessed in the year 1900. In a decree dated March 6, 1901, in the usual suit brought by the auditor general for the foreclosure of tax liens, it was held that this land was exempt under the statute above cited. There was no change in the situation between that and the following year. Two or more tracks in legitimate use for freight purposes are located upon parcels 1, 2, 3, and 5. Two lumber dealers, who ship in and out large amounts of lumber, unload their cars and pile their lumber along the tracks upon parcel 5.

There is no arrangement between these parties and the complainant in regard to the use of this land. It appears to be to the interests of all parties, as well as to the public, to leave this lumber there for sale and for reshipment. The Bennett Ice & Fuel Company occupies the west 60 feet of the seventh parcel under a written license made May 26, 1883. This license permits the Bennett Company to erect sheds for the purpose of loading and unloading coal and wood and shipping the same, and for no other purpose. No rent is charged. The sheds are to be removed whenever the company desires, upon 30 days' notice. Either party can at any time terminate the agreement, in which case the Bennett Company is to remove the sheds at its own expense. On the southwest corner of parcel 1 is located an elevator owned by one Brown, and erected under a written license February 27, 1888. By this agreement Mr. Brown was permitted to erect a building at this place at his own expense, to be used for the purpose of a grain elevator and a warehouse, and not to be rented or let to any other party without the written consent of the railroad company. On parcel 2 a similar license was given by complainant to Hulst & Van Heulen on July 16, 1900, giving them the right to use a piece of land described by metes and bounds, and containing 23,430 square feet, for the purpose of erecting a building to be used for a coal and wood yard, and for no other purpose. A similar license, dated October 2, 1900, was also granted to the South Grand Rapids Ice & Coal Company, containing an area of 21,615 square feet, to be used for the same purpose as that granted to Hulst & Van Heulen. A track runs through the center of this parcel north and south, from which Hulst & Van Heulen and the ice and coal company receive and ship their freight.

The statute taxing railroads in 1901 provided that on all gross income not exceeding $2,000 per mile railroads should pay $2\frac{1}{2}$ per cent. on such gross income; upon that in excess of $2,000 and not exceeding $4,000 per mile, $3\frac{1}{4}$ per

cent.; on all in excess of $4,000 and not exceeding $6,000 per mile, 4 per cent., etc.   The statute then provided:

"The taxes so paid shall be in lieu of all other taxes upon the properties of such companies, except such real estate as is owned and can be conveyed by such corporations under the laws of this State, and not actually occupied in the exercise of its franchises, and not necessary or in use in the proper operation of its road, but such real estate so accepted [excepted] shall be liable to taxation in the same manner and for the same purposes and to the same extent and subject to the same conditions and limitations as to the collection and return of taxes thereon as is other real estate in the several townships or municipalities within which the same may be situated." 2 Comp. Laws, § 6277.

If these lands are in actual present use for railroad purposes, they are exempt from further taxation, having already paid the tax under the law above cited. If they are not so used, but are held for future use, or for the accommodation of private parties, then they are subject to taxation.

An elevator built by a railroad company for the purpose of storing grain for hire after its liability as a common carrier has ceased is not exempt from taxation. *Milwaukee, etc., R. Co.* v. *City of Milwaukee*, 34 Wis. 271.

An elevator erected by a railroad company at a terminus of the road and used for transshipping grain and relieving cars of their lading, the grain remaining in the elevator until called for by the consignee, and a charge made if permitted to remain over 10 days, was held a necessary part of its equipment, and not subject to taxation. *Pennsylvania R. Co.* v. *Mayor, etc., of Jersey City*, 49 N. J. Law, 540 (9 Atl. 782, 60 Am. Rep. 648).   See, also, *In re Swigert*, 119 Ill. 83 (6 N. E. 469).

A railroad company may lease its wharves and docks when not in use by it, and charge wharfage therefor, without being subject to taxation, provided that the use by the lessee is subordinate to the use of the railroad company. *Osborn* v. *Railroad Co.*, 40 Conn. 498.

An elevator situated 900 feet from the right of way of a railroad company, together with 20 acres on which it was located, and the spur track there, is held exempt. *State* v. *Railway Co.*, 86 Tenn. 438 (6 S. W. 880).

It is said in *Milwaukee, etc., R. Co.* v. *Supervisors of Crawford Co.*, 29 Wis. 116, that provisions of this character should receive a fair and liberal construction in favor of the company, because they are not exempt from taxation, but are required to pay their share of the public burdens by another method. If the grounds, buildings, and tracks are reasonably suitable and proper, and are in use for the furtherance of the business of the railroad company, they are exempt from other methods of taxation.

We held in *Auditor General* v. *Railroad Co.*, 114 Mich. 682 (72 N. W. 992), that where two lumber firms occupy a part of the docks, but paid no rent, and it was a convenience to the company in shipping lumber over its road, and the entire lumber was so shipped, and the land was constantly used in shipping freight, it was not subject to general taxation.

This court held that an elevator used as a warehouse in connection with its regular business as a common carrier was not subject to a general tax. *Detroit, etc., Station Co.* v. *City of Detroit*, 88 Mich. 347 (50 N. W. 302).

Parcel 10, with its seven tracks, used for storing cabooses, coal, receiving and discharging freight, coaling engines, running its cars to its repair shops situated close to the south end of the parcel, and receiving material for its shops, is exempt. The circuit court for the county of Kent in chancery so held as to the tax of 1900 in a decree brought by the auditor general to foreclose lands delinquent for taxes. The condition was the same in 1901 as in 1900. Whether that decree is res adjudicata depends upon whether the city was party or privy to that suit. It is unnecessary to determine this question, inasmuch as we hold that the decree was right.

The fact that the complainant permitted the Bennett Company and other parties to erect buildings upon its land in which to receive and send out freight is in furtherance of the convenience of both carrier and shipper, and, we may fairly conclude, for the benefit of the general public. Because, the better the facilities for receiving and shipping, the less the cost. The Bennett Company pays annually about $30,000 to the complainant for carrying its merchandise, consisting mainly of coal, bulky and requiring temporary storage. Upon this amount it has already paid a tax. If the company owned these shops, and there discharged its freight to be delivered and received by the consignee, this would certainly be a legitimate use for the purposes of the company. It is no less the legitimate use because a party doing an immense business is permitted to erect its own sheds in which to receive the freight. These buildings are the personal property of the Bennett Company, and are subject to taxation. The parties, for their own convenience and that of the railroad company, have erected them, and they evidently facilitate the business of both. The Bennett Company has not the control of the track. This is under the control of the complainant, and when not in use in loading or unloading freight for the company can be and is used in handling freight for the other parties. The same is true of all the tracks. It is certainly a legitimate use of its land to run a side track thereon for the purpose of loading and unloading lumber. It does not make that use illegitimate, within the meaning of the law, because the parties are permitted to pile their lumber upon the land near by, awaiting delivery or reshipment. All these tracks and buildings are used solely for receiving and transporting freight. The complainant makes no charge for their use. The traffic at this point is large, and, we think, comes fairly and honestly within the legitimate use of the railroad company, so as to exempt it from general taxation under the statute.

Decree should be reversed, and decree entered here for complainant, with costs of both courts.

HOOKER, J. (*dissenting*). Complainant's bill was filed to restrain the city of Grand Rapids from collecting a tax levied upon several parcels of land, all of which were covered by tracks of the complainant's railroad. As the law now stands, similar questions cannot hereafter arise, complainant's claim being based on the law in force in 1901, which imposed a specific tax of $2\frac{1}{2}$ per cent. upon the gross earnings of railroads, and relieved their property from other taxation, except such property as they should not actually occupy in the exercise of their franchises, and was not necessary or in use in the proper operation of the roads. While the land in controversy is described as separate and distinct parcels, such parcels are contiguous to each other, except as they are separated by city streets, and they are all within the yard of the company at Grand Rapids; and, as we view the testimony, all were used, in whole or in part, for railroad purposes, such as switching and storing cars, loading, unloading, and storing freight, etc. Upon some of the parcels there were wedge-shaped pieces between tracks, and strips of land of greater or less width outside of the tracks, which the defendant claims were either not used at all or were given over to the private use of individuals under leases or licenses, for the storage of wood, coal, and lumber.

As to the former of these classes, we are of the opinion that the wedge-shaped and other parcels, if not used for tracks, or not occupied by cars or other property of the railroad, or used for the loading or unloading of freight, were nevertheless in use for railroad purposes. They were so located as to be comparatively, if not wholly, useless for any other purposes, and the safety of trains is promoted by an absence of crowding and by the increased advantages of vision which open spaces afford.

The authorities have been liberal in construing the law where railroads have not used land contiguous to their tracks for purposes foreign to railroad business. It is a fact well known that there are miles of right of way in the country crossed by but a single track. It has never been

proposed to subject any part of this to local taxation upon the ground that it is not in use for railroad purposes, or is a provision for future use. The strip of land in dispute in this case is two or three or four times as wide, but the requirements of the company, and the business done over it, are proportionately much larger than that done over country tracks. We are of the opinion that the land appropriated by the complainant is not unreasonable in amount, and that it was not subject to local assessment upon the ground that it was not used for railroad purposes, except such parts thereof as were appropriated to other uses, if there were any such.

The evidence shows that portions of this yard were devoted to the loading and unloading and storing of freight. We understand that defendant does not claim that land used for the loading or unloading of freight, to be drawn away immediately, is not used in connection with the business of the railroad. We are not sure that it would be claimed that such use would not properly include temporary storage of heavy and bulky commodities upon the ground or in sheds erected by the company for the purpose. At all events, we understand it to be a common and proper practice for railroads to store freight in depots and warehouses until called for, and that the practice is well within the proper management of their business, and in fact could not be safely omitted; and we know of no reason why the rule does not include grain, wood, coal, and lumber. These are bulky articles, and it is important that they be not subjected to the necessity of repeated drayage. It is the general practice for dealers in such commodities to deliver them to the consumer from the car where practicable, and otherwise store them where unloaded from the car until sold. Some dealers own or rent their sheds or yards, and induce the railroads to run sidings to them. In the present case the railroad appears to have been willing to allow such storage upon its land adjacent to its sidings.

The evidence shows that upon one of these parcels the

complainant has permitted one Brown to erect a building to be used as a grain elevator. Upon other portions different persons have been assigned specific places for the unloading, loading, and storing of wood, coal, and lumber brought in or to be shipped out upon complainant's cars or over its road. Written authority has been given in some cases, in others verbal; but it is our understanding that in no case is such authority more than a license, and in no case is rent reserved or paid. If this is such a use as to bring these parcels within the exception of the statute, the complainant must fail; but if it is a proper and legitimate use of the land for the purposes of complainant's business, its complaint should be sustained.

The statute in question need not necessarily be called a statute of exemption to be strictly and technically construed against the complainant. It provides a tax by appropriating a percentage of complainant's gross income, and, instead of saying that it shall be exempt from other taxes, says that this specific burden shall be *in lieu* of all other taxes. Which method would be productive of the greater revenue may be an open question. Certainly there is no presumption against the specific tax. A reasonable construction would seem to be that the legislature proposed to apply the specific tax to all productive property of railroads where used for railroad purposes, but not to allow them to escape taxation upon property that they did not see fit to use at all, or to devote to other and perhaps less productive purposes. See *Kimball* v. *Milford*, 54 N. H. 406; *Gardner* v. *State*, 21 N. J. Law, 560.

In *City of St. Paul* v. *Railway Co.*, 39 Minn. 112 (38 N. W. 925), it was said:

"These charters do not exempt the property from taxes, but provide a substituted method of taxation, based upon the assumption that the property of the companies will be used for railroad purposes, and thereby an income be derived, the percentage of which received by the State will be equivalent in its results to taxation of the property." Citing *County of Ramsey* v. *Railway Co.*, 33 Minn. 537 (24 N. W. 313).

In *Milwaukee, etc., R. Co.* v. *Supervisors of Craw-ford Co.*, 29 Wis. 123, it was said:'

"The payment of this sum into the State treasury, and which is called 'license money,' must, in the light of past legislation upon the subject, be regarded as, in the judgment of the legislature, an equivalent for the taxes which those companies would otherwise be required to pay if assessed and taxed according to the ordinary method prescribed by law. A strict construction of the statute, therefore, against the company, or a liberal one in favor of the public, can, with difficulty, be justified in view of what seems to have been the legislative intent, and it would seem that little or no effect can be given to the rule. We are at liberty, therefore, and, indeed, required, to give the statute a fair and liberal construction in favor of the company, or such an one as it should receive supposing there is no injustice in the claim made by the company, or advantage to be gained by it over the public or taxpaying community generally in avoiding the taxation complained of."

If we were without authority upon this subject, and the case were therefore one to be decided upon "first impression," justice would require that weight be given to the effect of such use. Manifestly, the earnings from freight handled for these persons in connection with their use of said parcels furnish revenue to the State; and, if the lands are also to be taxed, the public obtains additional revenue, although the use of the land has been directly instrumental in producing taxable revenue for the company, in the exact way that the statute contemplates, and not through uses foreign to the railroad purpose.

Mr. Justice GRANT has alluded to several cases where elevators owned and operated by railroads have been held to be structures properly connected with the railroad business. We may take judicial notice that nearly all the grain of the country is the subject of shipment, and, as has been often said, the facilities for loading afforded by an elevator are as appropriate to the loading of grain as derricks or trucks are for loading heavy freight.

In *Pennsylvania R. Co.* v. *Mayor, etc., of Jersey*

*City*, 49 N. J. Law, 540 (9 Atl. 782, 60 Am. Rep. 648), it was held that a grain elevator built by the road, and used for storing and transshipping grain, was used for railway purposes, and not taxable locally.    It was there said:

"It appears in the evidence that the elevator is used for transshipping grain and relieving cars of their lading. The elevator does by machinery what was before done by hand, and appears to be one of the necessary terminal facilities of a railroad engaged in the transportation of large quantities of grain.    It further appears that the grain passing through this elevator, if not called for by the consignee, is retained there, and if it remains in store for over ten days a charge is made of one-quarter of a cent per bushel for each ten days thereafter.    Before the elevator was built, grain was sometimes detained in the cars, and when so detained a demurrage charge of $5 or $10 a day per car, or two cents per bushel, was paid by the consignee. Other trunk lines to the west had erected elevators prior to the erection of the one in question.    They are used as freight houses for grain, and seem to be as indispensable to the railroads in handling the immense quantity of grain which they carry as any other freight houses used for the reception or unloading of merchandise transported. If grain was allowed to remain in the elevator until called for without charge, it would unquestionably be an appliance for railroad purposes.    The fact that a small penalty is added to the freight charge to induce shippers to remove their grain within a reasonable time does not withdraw this structure from that class of improvements which are necessary for railroad uses, within the meaning of that term as construed in *State* v. *Hancock*, 35 N. J. Law, 537."

A similar case will be found in *State* v. *Railway Co.*, 86 Tenn. 438 (6 S. W. 880).    See, also, *In re Swigert*, 119 Ill. 83 (6 N. E. 469), and *Gilkerson* v. *Brown*, 61 Ill. 486.

The question is settled in this State where the Union Depot Company owns and operates the elevator, by the case of *Detroit, etc., Station Co.* v. *City of Detroit*, 88 Mich. 347 (50 N. W. 302).

In the present case the complainant did not own the elevator, and therefore derived no profit from the storage or handling of grain.    It allowed another to erect an eleva-

tor upon its grounds, thereby obtaining the usual facilities for loading grain without cost to itself. This elevator was subject to taxation to the person owning it, as was held in the case of *Gilkerson* v. *Brown*, 61 Ill. 486, and, so far as the land was concerned, it was devoted to railway purposes as fully as though the company had owned and managed the structure. So the coal sheds erected by dealers would be subject to local taxation. Thus, in both instances, the city would profit by such practice, for, if the elevator or sheds were erected and controlled by the railroad company, they would not be subject to local taxation.

Stress is laid upon the claim that the owners of the elevator and those who owned the coal, wood, and lumber were allowed to use the land for their own private purposes, and it is argued that this is controlling. We should not feel justified in holding that a railroad company might escape local taxation upon lands leased by it to others and devoted to manufacturing or mercantile purposes; but neither does it seem reasonable that land in its yards, which is in daily use for the unloading of freight from its cars, is to be taxed merely because the company permits its use for temporary storage until the property can be transshipped or sold and delivered about town, or because, in the economical conduct of its business, it sets aside given portions for large shippers who manage their business from there. Great abuses of such privileges do not necessarily follow. Each case must rest upon its own facts, and evasions can be detected and excepted from the application of the rule.

The case of *Auditor General* v. *Railroad*, 114 Mich. 682 (72 N. W. 992), is in point upon this case. In that case the railroad company owned a piece of land in Bay City, near the river, and a dock. The company was said to have used that land constantly in "originating [whatever that may mean] and shipping freight." The uncontradicted proof shows that the land was occupied by two lumber firms; i. e., "lumber dealers," who "had lumber yards upon it," and were in the habit of shipping such

lumber as they shipped by rail over the company's road. There was also a fish house on the dock, used by Tromper & Co. for preparing fish for shipment over the road. No rent was paid. The inference to be drawn from the record is that all of these persons were licensees, in exclusive occupancy of certain portions of the land for the purposes mentioned. It was held that such holding was a convenience to the railroad company, and that the land was not subject to local taxation.

The present case seems to be clearly within the principle laid down in the two Michigan cases cited. I concur in the opinion and conclusion reached by Mr. Justice GRANT.