JOHN HANCOCK MUTUAL LIFE INSURANCE CO. *v.*
FORD MOTOR COMPANY.

1. INSURANCE—FOREIGN COMPANIES—HOUSING PROJECTS.

A foreign insurance company has the right and power to construct, maintain and operate a housing project on land within this State, and to hold such land while it is thus being used for a period of time in excess of 10 years where they are authorized to operate such projects in the State under the laws of which they are organized, there being no prohibition in the Constitution against the granting of such privilege to a corporation formed for the purpose of engaging in that business (3 Comp. Laws 1929, §§ 12298, 12312, 12313, as amended by Act No. 45, Pub. Acts 1948 [Ex. Sess.]).

2. EVIDENCE—JUDICIAL NOTICE—SHORTAGE OF ADEQUATE HOUSING FACILITIES.

In suit involving the construction of statute authorizing insurance companies to operate housing projects, judicial notice is taken by the Supreme Court of the fact that presently there is a critical shortage of adequate housing facilities, that

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 23 Am. Jur., Foreign Corporations, § 164.
[1, 7, 8] Right of foreign corporations to own real property. 24 L.R.A. 322.
[2] 20 Am. Jur., Evidence, § 100.
[3] 11 Am. Jur., Constitutional Law, § 59.
[4] 11 Am. Jur., Constitutional Law, § 65.
[5, 6] 11 Am. Jur., Constitutional Law, § 51.

derivative social implications thereof are a matter of public concern, having a profound effect upon the health, morals and welfare of the community, and that large amounts of capital will have to be attracted to investments in housing facilities which will normally be furnished only through corporations whose right to hold them for more than 10 years may not be challenged by the State (Const. 1908, art. 12, § 5; 3 Comp. Laws 1929, §§ 12298, 12312, 12313, as amended by Act No. 45, Pub. Acts 1948 [Ex. Sess.]).

3. CONSTITUTIONAL LAW—CONSTRUCTION—INTENT.

In construing a provision of the Constitution, there should be given to it a reasonable and practical interpretation which gives effect to the intent and purpose of its framers and the persons who adopted it.

4. SAME—CONSTRUCTION—ORDINARY MEANING GIVEN TO WORDS.

In construing a provision of the Constitution, words therein are not to be given a technical meaning but are to be used in their natural, obvious and ordinary meaning, in that sense which common usage justifies.

5. SAME—INTERPRETATION OF CONSTITUTION AS A LIVING INSTRUMENT.

The Constitution is a living instrument, and should be interpreted in such a manner that it will remain adaptable to the necessitudes of changing conditions.

6. SAME—INTENT—BASIC FOUNDATION OF STATE.

A State Constituton is not intended to be a limitation on the healthful development nor an obstruction to the progress of the State for which it announces basic principles to serve as a perpetual foundation.

7. CORPORATIONS—HOLDING OF LAND—CONSTITUTIONAL LAW.

A corporation which uses land it has acquired for corporate purposes under its franchise, occupies such land within the meaning of the exception to the constitutional prohibition against corporate ownership of real estate for more than 10 years.   (Const. 1908, art. 12, § 5).

8. CONSTITUTIONAL LAW—CONSTRUCTION—ACTUAL OCCUPATION OF REAL ESTATE BY CORPORATION.

"Actually occupied," as that term is used in exception to provision of the Constitution prohibiting corporations from holding real estate longer than 10 years, does not mean the land needs to be occupied in an exclusive physical sense, but rather that corporations should have the power to own and hold such real

estate as is necessary for the carrying on of the business which they have been authorized to engage in by the legislature (Const. 1908, art. 12, § 5).

9. EVIDENCE—JUDICIAL NOTICE—CONDUCT OF CORPORATE BUSINESS BY AGENTS.

Judicial notice is taken of the fact that corporations, in carrying on their affairs must act through agents and employees and that in the operation and maintenance of a housing project, a corporation must necessarily have such agents and employees upon the premises (3 Comp. Laws 1929, §§ 12298, 12312, 12313, as amended by Act No. 45, Pub. Acts 1948 [Ex. Sess.]).

10. CORPORATIONS—LANDLORD OF HOUSING PROJECT—ACTUAL OCCUPANCY OF REAL ESTATE—CONSTITUTIONAL LAW.

A corporation in its capacity as landlord of a housing project, and through its agents and employees, exercises dominion over premises sufficient to constitute actual occupancy thereof within the meaning of the exception to the provision of the Constitution prohibiting a corporation from holding real estate for more than 10 years (Const. 1908, art. 12, § 5; 3 Comp. Laws 1929, §§ 12298, 12312, 12313, as amended by Act No. 45, Pub. Acts 1948 [Ex. Sess.]).

11. COSTS—PUBLIC QUESTION—OPERATION OF HOUSING PROJECT BY FOREIGN INSURANCE COMPANY.

No costs are allowed in foreign insurance company's suit for specific performance of contract to convey land for use as a housing project, wherein defendant vendor claimed plaintiff was prohibited by the Constitution from holding such land more than 10 years, a public question being involved (Const. 1908, art. 12, § 5; 3 Comp. Laws 1929, §§ 12298, 12312, 12313, as amended by Act No. 45, Pub. Acts 1948 [Ex. Sess.]).

SHARPE and REID, JJ., dissenting.

Appeal from Wayne; Jayne (Ira W.), J.  Submitted April 8, 1948.  (Docket No. 43, Calendar No. 44,048.)  Decided September 8, 1948.

Bill by John Hancock Mutual Life Insurance Company, a Massachusetts corporation, against Ford Motor Company, a Delaware corporation, to specifically enforce contract to convey real estate.  Bill

dismissed. Plaintiff appeals. Reversed and decree entered.

*Dickinson, Wright, Davis, McKean & Cudlip (Selden S. Dickinson* and *Edgar C. Howbert,* of counsel), for plaintiff.

*William T. Gossett (Charles J. Fellrath,* of counsel), for defendant.

*Raymond J. Kelley,* Corporation Counsel, and *Vance G. Ingalls,* Assistant Corporation Counsel, for City of Detroit, *amicus curiae.*

REID, J. (*dissenting*). The bill in this case was filed to enforce specific performance of a contract to convey lands. From a decree for defendant, the plaintiff appeals.

The facts are set forth in the pleadings. On November 20, 1947, plaintiff John Hancock Mutual Life Insurance Company (hereinafter referred to as Hancock), a Massachusetts corporation, entered into a land contract with the defendant Ford Motor Company (hereinafter referred to as Ford), providing for Hancock's purchase of land in Wayne county, upon which Hancock proposed to build a housing project. A condition of Ford's obligation to convey the land to Hancock was that Hancock should have the right to own and operate the project for 30 years or more and should not be subject to any requirement of the State of Michigan to divest itself of such ownership (except by an exercise of the power of eminent domain). On November 26, 1947, Ford wrote Hancock of its decision not to convey the property to Hancock, Ford being of the opinion that Hancock could not comply with the above-mentioned condition of the agreement. On December 12, 1947, Hancock filed its bill of complaint against Ford for

specific performance of the land contract. In its answer, Ford alleged Hancock's inability to comply with the condition.

Defendant Ford asserted that plaintiff Hancock could not own and operate the housing project for 30 years or more for two reasons; First, that the statutes of the State of Michigan do not permit a foreign insurance company to invest its funds in such enterprise, such investment being forbidden to a Michigan insurance company; and second, that article 12, § 5, of the Michigan State Constitution of 1908, does not permit plaintiff to hold such real estate more than 10 years, the project being for rental and income purposes, and the lands not to be actually occupied by Hancock in the exercise of its franchise.

Since this case was submitted in this Court, the State legislature has enacted Act No. 45, Pub. Acts 1948 (Ex. Sess.),* approved May 14, 1948, to take immediate effect. Defendant Ford concedes that as amended by said Act No. 45, Pub. Acts 1948 (Ex. Sess.), the provisions of the insurance code of Michigan (3 Comp. Laws 1929, §§ 12298, 12312, 12313) do not prohibit insurance companies from owning housing projects in Michigan, if permitted to do so by their domiciliary laws. The first question raised by defendant therefore needs no further consideration at our hands.

The second question, however, still remains for our determination. That question involves a construction of article 12, § 5, of the Michigan State Constitution of 1908, which is as follows:

"No corporation shall hold any real estate for a longer period than ten years, except such real estate as shall be actually occupied by such corporation in the exercises of its franchises."

---

* See Stat. Ann. 1948 Supp. §§ 24.77, 24.91, 24.92.—REPORTER.

We are not concerned in this case with the question of who may enforce the provisions of this section, for which see *Pere Marquette Railroad Co.* v. *Graham*, 136 Mich. 444, and *German Corporation* v. *Negaunee German Aid Society*, 172 Mich. 650. So long as any authority exists which could enforce a limitation of plaintiff's ownership to a 10-year period, plaintiff could not comply with the terms of its agreement to own, operate and manage the housing project for a period of 30 years or more and not be subject to any requirement to dispose of the lands prior to the expiration of 30 years.

The above quoted section in the Constitution of 1908 omits the words, "hereafter acquired," which words appeared in a section (otherwise identical) in the Constitution of 1850 following the words, "any real estate." Plaintiff claims that the section in question was without much thought and "out of historical inertia" carried from the Constitution of 1850 into the draft of the Constitution of 1908, but that in the meantime the midwest had been settled and developed and that "apprehended evils attendant [upon] the corporation holding of land" have become "largely—if not entirely—historical." However, the framers of the Constitution of 1908 took pains to eliminate the two words, "hereafter acquired," thus demonstrating that they were carefully considering the provisions of the section in question.

This Court has in *Thompson* v. *Waters*, 25 Mich. 214, 228 (12 Am. Rep. 243), determined in 1872 as follows:

"The main, if not the only, evils to be apprehended from allowing corporations, domestic or foreign, to take, hold or convey lands are: 1st,—The danger of their becoming speculators in lands to large amounts, keeping them unimproved and thereby retarding the progress of settlement and improvement,

or, if improved, preventing settlers from obtaining clear or independent titles, and *introducing a system of tenancies in which the tenants would be, in a great measure, dependent upon such corporations;* 2d,— The holding of such lands for a long period of time, as they pass by perpetual succession without any change or break by death, as in the case of natural persons; and 3d,—The influence which wealthy corporations, holding large bodies of land in the State, might exercise upon the legislature." (Italics supplied.)

It can be considered that some such matters as above expressed were the considerations for the reincorporation (with the exception of the two words above noted) of the section in question in our State Constitution in 1908.

The trial judge took judicial notice of a general housing shortage in Michigan. Plaintiff asks us to construe the section in question (Const. 1908, article 12, § 5) liberally so as to enable plaintiff to invest capital in Michigan. Plaintiff argues that the evils against which the section in question was framed have become historical and are no longer existent. We do not assume that the evils before mentioned or dangers therefrom do not now exist in the same form or in a modern equivalent thereof. The Constitution provides a method for amendment and we are concerned here only with giving to the Constitution the effect intended by its framers. We do not undertake to alter the Constitution to suit a supposed present necessity for permitting corporate capital to own residential buildings in Michigan for more than 10 years.

Plaintiff claims that the words "actually occupied" in the section in question would admit of plaintiff's operation of a housing project because the occupation by the tenants in the housing facilities would be the occupation of plaintiff as landlord and be-

cause maintenance and repair employees in discharge of their duties would have access to the various buildings of the project and thus characterize the relationship of the owner to the property as that of an actual occupant.

It is of primary importance in this case to determine the meaning of the words "actually occupied," appearing in the section in question. This Court has had occasion to construe the meaning of those words in *Detroit Young Men's Society* v. *Mayor, etc., of Detroit,* 3 Mich. 172. In that case the words, "actually occupied," occurred in an act for assessing property and collecting taxes, which (among other things) provided that "the personal property of all library, benevolent, charitable and scientific institutions, incorporated within this State, and such real estate belonging to such institutions as shall be actually occupied by them, for the purposes for which they were incorporated," are exempt from taxation. In that case the plaintiff owned a building on Jefferson avenue in Detroit. The lower or first story (not being required for the uses of the society) was finished into two stores, which, with the cellars below them, were leased by the society for business purposes, for a given rent, as were, also, two small offices in the second story. The remainder of the building was used entirely for the purposes of the society, and as to the remainder of the building, the society was found exempt, the words of the opinion decreeing the exemption being, page 184, "subject to a deduction of the value of the tenements actually used and occupied by them for the purposes for which they were incorporated." It will thus be seen that this Court has decided that at least under the statute giving a certain exemption from taxation, the words, "actually occupied," do not include portions of buildings or parts of real estate rented.

We have further to consider the case of *Grand*

*Rapids & Indiana Railway Co.* v. *City of Grand Rapids,* 137 Mich. 587 (4 Ann. Cas. 1195), quoting from the syllabus (2),

"Lands owned by a railroad, but in possession of private individuals, and used exclusively by them in their individual business for wood and coal yards and sheds and storage of grain, etc., are neither 'actually occupied' by the railroad nor 'necessary or in use in the proper operation' of the road within section 6277, 2 Comp. Laws 1897,* and are therefore properly taxable as other real estate under the general law."

The supreme court of Oregon in the case of *Hibernian Benevolent Society* v. *Kelly,* 28 Ore. 173 (42 Pac. 3, 30 L.R.A. 167, 52 Am. St. Rep. 769), was considering a subdivision of a taxation statute which provided that "the personal property of all literary, benevolent, charitable, and scientific institutions, incorporated within this State, and such real estate belonging to such institutions as shall be actually occupied for the purposes for which they were incorporated," shall be exempt from taxation. The court said, pages 193, 194:

"It is the actual occupancy of the property which determines its right to exemption, and not the use made of its proceeds. The plain and obvious meaning of the statute is that only the real estate actually occupied and in use by these different institutions for the purposes for which they were organized shall be exempt from taxation. While so occupied and used, it does not come in competition with the property of other owners; and the purpose for which it is used was supposed by the legislature to be a sufficient benefit to the public to justify its exemption from the burdens of taxation imposed upon other property. But, when such property is used *for the*

---

* This is 2 Comp. Laws 1929, § 11166 (Stat. Ann. § 22.257).— REPORTER.

*purpose of accumulating money,* the law imposes upon it the same burden of taxation as it imposes upon other property similarly situated." · (Italics supplied.)

It is apparent that the Oregon court construed the words, "actually occupied," to designate the unrented portions or descriptions of real estate in the direct control and possession of the owner as distinguished from portions or descriptions of real estate rented and used "for the purpose of accumulating money," but occupied by the owner's tenants.

In the case at bar, so far as plaintiff proposed to construct for rental purposes, or income-producing purposes, a housing project, including apartment or tenement buildings and dwellings or other buildings, the section of the Constitution (article 12, § 5) forbids plaintiff holding such lands for a longer period than 10 years.

The decree appealed from made reference to a written opinion filed in the cause, "with the same force and effect as if the same were herein word for word set out." The written opinion contains reasoning and conclusions of law with which we are not in accord, especially as to the construction of the State Constitution. The decree appealed from is to be considered as modified for that reason. ·

The Constitution of the State forbids the holding of the lands by plaintiff under the conditions and for the purposes contemplated for a period longer than 10 years. The decree appealed from should be affirmed for the reasons set forth in our opinion herein. Costs to defendant.

SHARPE, J., concurred with REID, J.                    .

BUTZEL, J. John Hancock Mutual Life Insurance Company, herein referred to as Hancock, is entitled to the decree of specific performance prayed for in

its bill of complaint. It has the right and power to construct, maintain and operate a housing project on the land it seeks to purchase from defendant, Ford Motor Company, and to hold such land while it is thus being used for a period of time in excess of 10 years.

As stated in the foregoing opinion, the Michigan insurance code (3 Comp. Laws 1929, §§ 12298, 12312, 12313) was recently amended by Act No. 45, Pub. Acts 1948 (Ex. Sess.)* to empower foreign insurance companies doing business in this State to invest their funds "in housing projects including incidental retail and service facilities within the State of Michigan, if such investment is within the franchise of such insurer under the laws of the State or country under which such insurer is organized." There is no question but that under its franchise from the State of Massachusetts Hancock is authorized to purchase real property in any State of the United States in which it is authorized to transact business and to construct, maintain and operate thereon a housing project.

The net effect of Act No. 45, Pub. Acts 1948 (Ex. Sess.) is to grant to domestic and foreign insurance companies the privilege and right to engage in the business of owning, operating and maintaining housing projects within the State of Michigan. The Constitution of our State contains no prohibition against the granting of such privilege to a corporation formed for the purpose of engaging in that business, nor is there any reason why such privilege may not be granted to an existing corporation, specifically, to an insurance company.

The only question to be disposed of is whether or not article 12, § 5, of our State Constitution, which provides that "no corporation shall hold any real estate for a longer period than ten years, except

---

* See Stat. Ann. 1948 Supp. §§ 24.77, 24.91, 24.92.—REPORTER.

such real estate as shall be actually occupied by such corporation in the exercise of its franchises," prevents a corporation which has been empowered by the legislature to engage in the business of owning, operating and maintaining a housing project from holding the real estate necessary for the carrying on of such business for a longer period than 10 years.

We take judicial notice of the fact that at the present time a critical shortage of adequate housing facilities exists in our State, particularly in the county of Wayne, and that the derivative social implications thereof are a matter of public concern, having a profound effect upon the health, morals and welfare of the community. We also take notice of the fact that large amounts of capital will have to be attracted to investments in housing facilities if the presently existing condition is to be alleviated, and that such capital as a rule cannot or will not be furnished by individuals, but only by or through corporations formed for that purpose or having funds to invest. Needless to say, such corporations will hesitate to make such investments if their right to hold them for a longer period than 10 years may be challenged by the State.

In the foregoing opinion, the cases of *Detroit Young Men's Society* v. *Mayor, etc., of Detroit,* 3 Mich. 172, and *Grand Rapids & Indiana Railway Co.* v. *City of Grand Rapids,* 137 Mich. 587 (4 Ann. Cas. 1195), are relied upon to support the interpretation placed upon the term "actually occupied" as used in article 12, § 5, of the Constitution. In each of these cases the Court was called upon to construe a statute which granted exemption from taxation to certain institutions and corporations as to lands actually occupied by them in the exercise of their privileges and franchises. In *Grand Rapids & Indiana Railway Co.* v. *City of Grand Rapids, supra,*

we held that land owned by a railroad but in the possession of private individuals who used it in their individual businesses for lumber and coal storage yards, grain elevators, et cetera, was not actually occupied by the railroad so as to be exempt from taxation under the statute. The Court said on page 591:

"When, by the consent of a railway company, its land is exclusively devoted to a business in which it cannot lawfully engage—a business foreign to the purpose of its organization—such land is not, in my judgment, 'actually occupied' by it, and is 'not necessary or in use in the proper operation of its road,' and is, therefore, under the statute, * * * taxable 'like other real estate.' "

Here, Hancock may lawfully engage in the business of operating a housing project—the legislature has granted it this privilege. Therefore, the test applied in the cited case, *i. e.,* whether or not the land is devoted to a business in which the corporation can lawfully engage, only operates to sustain the power of Hancock to hold the real estate for a longer period than 10 years.

In *Detroit Young Men's Society* v. *Mayor, etc., of Detroit, supra,* it was held that that portion of a building owned by a charitable institution which was rented to a commercial enterprise was not exempt from taxation under the statute, the Court reasoning that the actual occupancy contemplated by the statute must be "exclusive." The Court said:

"Exemption laws of this character, though beneficient in their objects, are in derogation of equal rights, and must be construed strictly."

This reasoning has no application in the instant case, as here we are not confronted with a statute which must be strictly construed, but rather with a constitutional provision, a part of our fundamental

organic law, which should be given a reasonable and practical interpretation which gives effect to the intent and purpose of its framers and the persons who adopted it. Words used therein are to be given their natural, obvious and ordinary meanings and not a technical meaning. In *M'Culloch* v. *Maryland,* 4 Wheat. (17 U. S.) 316, 414 (4 L. Ed. 579), Chief Justice Marshall said in discussing the interpretation to be placed upon a word used in the Federal Constitution:

"Such is the character of human language, that no word conveys to the mind, in all situations, one single definite idea; and nothing is more common than to use words in a figurative sense. Almost all compositions contain words, which, taken in their rigorous sense, would convey a meaning different from that which is obviously intended. It is essential to just construction that many words which import something excessive should be understood in a more mitigated sense—in that sense which common usage justifies."

The Constitution is a living instrument, and should be interpreted in such a manner that it will remain adaptable to the necessitudes of changing conditions. In 11 Am. Jur., Constitutional Law, § 51, p. 660, it is said:

"A Constitution usually announces certain basic principles to serve as the perpetual foundation of the State. It is not intended to be a limitation on its healthful development nor an obstruction to its progress. Accordingly, the courts are not inclined to adopt such a technical or strained construction as will unduly impair the efficiency of the legislature to meet responsibilities occasioned by changing conditions of society. It is proper to assume that a Constitution is intended to meet and be applied to new conditions and circumstances as they may arise in the course of the progress of the community. The

courts in this country have shown a determination to give our written Constitutions, by interpretation, such flexibility as will bring them into accord with what the courts believe to be public interest. Their terms and provisions are being constantly expanded and enlarged by construction to meet the advancing and improving affairs of men."

The constitutional provision in question first appeared in our Constitution of 1850. At that time we were emerging from an agrarian era and there were but few corporations in existence. No need had yet arisen for the many large structures and buildings which have since been built with corporate capital. There was a universal distrust of large corporations because of their monopolistic tendencies. Past history had demonstrated that when corporations accumulated vast tracts of agricultural land and held them for purposes of speculation, the progress of settlement and improvement in the State was retarded. Undoubtedly the framers of the Constitution had these things in mind when the provision was drafted.

In the Constitutional Convention of 1867 there was a lengthy debate regarding the purpose and meaning of the provision. It seems clear to us that those delegates to the convention who advocated the inclusion of the provision in the new Constitution were primarily concerned over the accumulation of vast tracts of lands by corporations for which they had no use in the carrying on of their corporate business. They were not concerned about the acquisition of lands by corporations for purposes consistent with the objects for which they were organized. Thus, Delegate Chapin, a proponent of the provision, said (1 Constitutional Convention Debates, 1867, p. 211 *et seq.*):

"We are suffering all over the State in consequence of the monopolizing of land by wealthy in-

dividuals as well as by corporations. I would not give corporations the right to hold these lands ANY LONGER THAN IS ABSOLUTELY NECES- SARY TO ENABLE THEM *TO REALIZE THEIR VALUE FOR THE PURPOSE FOR WHICH THEY WERE GRANTED.*"

Delegate McKernan, an opponent of the provision in the form in which it had been presented, said:

"I am opposed to this whole section, for I really consider that there is no necessity for it.

"This section looks to me like an attempt to discriminate against corporations. I am one of those who are not willing to go into class legislation, or to make any particular distinction for or against corporations. * * *

"I am willing to allow them (meaning corporations) all the privileges that should properly belong to them in the exercise of their franchises, and to allow them to hold the real estate necessary to enable them to carry on their business. That is as far as I am willing to go; I am not in favor of allowing them special privileges. * * *

"Our mining companies, more especially our iron companies, must possess a large amount of land in order to obtain the necessary fuel and timber to enable them to carry on their operations successfully. Some of them own as much as 10,000 acres of land, and use probably 10,000 cords of wood a year. And consequently, in order to carry on their business successfully for any length of time, they must own a large amount of land. But by the section here proposed to be inserted in the Constitution, they will be obliged to sell their land at the end of 10 years."

Delegate Morton answered this argument by saying:

"I think the words at the close of this section will cover all the cases in the Lake Superior country which have been referred to. The words I allude to are these:

" 'Except such real estate as shall be actually occupied by such corporation in the exercise of its franchises.'

"These iron companies desire the use of 200 or 300 acres of wood-land a year in the transaction of their business; and in the course of 10 or 15 years would consume all the timber upon the land they now have. And under that portion of this section which I have read, they will, even at the end of 10 years, be allowed to continue in possession of their lands, to any amount, when 'actually occupied by them in the exercise of their franchises.' "

The conclusion is inescapable that Delegate Morton understood the provision to mean that where a corporation uses the land which it has acquired for corporate purposes under its franchise, it "occupies" the land within the meaning of the provision. The full purpose of the provision is further demonstrated by the statement of Delegate Conger, another proponent of it, that

"It is desirable that there should be a limitation with regard to corporations holding lands *not necessary for the exercise of their franchises.* The Constitution should contain a provision to remedy this evil."

The matter was again debated in the Constitutional Convention of 1907–1908. Needless to say, conditions had changed in many respects since 1850. Many corporations were in existence, and it had become the usual and proper thing for large office buildings, hotels, apartments, et cetera, to be erected and owned by corporations formed for that purpose. In no other way could the vast amounts of capital which were required to make such improvements have been accumulated. This undoubtedly must have been known to the delegates to the Convention, for many of them were lawyers who practiced in this Court. At the Convention, a motion was made that

the provision in question be deleted from the new
Constitution on the ground that it no longer served
any useful purpose. (Proceedings and Debates of
Constitutional Convention of 1907–1908, pp. 337,
338.) Delegate Pratt, in making this motion, point-
ed out that corporations had been formed for the
purpose of dealing in real estate, and that such cor-
porations should be allowed to hold their property
until they were ready to sell it. Delegate Heckert,
a proponent of the provision, said in answer to this
argument:

"The reason that limitation is in there is to pre-
vent corporations from buying all the land lying ad-
jacent to them and whatever land would be adjacent
to that, and holding it indefinitely.   *   *   *   There
should be a limit placed somewhere on corporations,
*engaged in other business,* not that of buying or sell-
ing real estate.   *   *   *   Corporations engaged *in
another kind of business* ought not to be allowed to
buy and hold indefinitely all the land they are able
to pay for."

Delegate Townsend, another proponent of the pro-
vision, said:

"It (meaning the provision) certainly is nothing
unreasonable, and there are reasons why corpora-
tions *should not extend their powers outside of their,
general business, and engage in a business in which
they could accumulate or own and occupy and con-
trol large tracts of real estate.*"

Delegate Hawkins, also a proponent of the provi-
sion, said:

"This provision of the old Constitution, providing
that corporations should not hold real estate *except
that used by them* in the exercise of their corporate
powers, is salutary and wholesome. It has been a
part of our elementary law, of our Constitution, for
upwards of 50 years. Now, the only right by which

they may acquire and hold real estate, *outside of that used,* is inherent, and comes to them because of the fact that they may be compelled to take property by way of foreclosure, or to secure a debt in one form or another, or property which at the time they be in need of, but which when they are vested with their full powers and in the exercise of their full corporate powers *they do not need."*

Delegate Pratt's motion was lost. However, on a subsequent reading of the provision, a motion that it be stricken out of the Constitution was again made by him. (Proceedings and Debates, p. 1345.) Delegate Townsend replied:

"I cannot understand why the motion was made. It is a provision that is in the old Constitution. It was evidently thought at the time the old Constitution was framed that it was important to limit the time real estate could be held by corporations. I do not know why the same reason does not exist today as it did then."

And upon being asked what this reason was, he said:

"The only reason we can give is that corporations are created only by law, and only exist by virtue of the law. This is one of the restrictions it has always been thought wise to place upon them, that they shall not accumulate or rather purchase a quantity of real estate and hold it, *except for the purposes of their business.* Now, why we should strike this provision out I cannot see. If it ever had any use it certainly has the same use today."

Delegate Pratt then argued:

"What possible good is to be conserved by this provision? I cannot explain why the framers of the Constitution of 1850 put it into the Constitution, unless it was born of the universal distrust of corporations at that time. At present we are beyond that

.

.

distrust. There are corporations organized and created under the laws of this State for the purpose of buying and selling real estate. Now, why those corporations should not be allowed to hold their real estate until they get ready to sell it, I cannot conceive. Why a railroad company which thinks that at some time it may have to use a certain piece of property for a siding, should not be allowed to buy it and keep it I cannot understand."

To which Delegate Townsend replied:

"In answer to that I would say that so far as buying and selling real estate is concerned there is certainly no question but that they have authority to buy and sell real estate when that is their business under their charters; it never has been questioned that they have that right. This provision is here for the purpose of preventing them from owning real estate in large tracts, *for which they have no use at all in the exercise of their franchises, and which they do not use in their business.*"

It was thus recognized in the discussions that the provision was intended only to prevent corporations from accumulating real estate which they had no use or need for in the carrying on of their business. It was not asserted by any of the proponents of the provision that land, to be "actually occupied" by a corporation, had to be occupied in an exclusive physical sense. To the contrary, it was admitted that corporations should have the power to own and hold such real estate as is necessary for the carrying on of the business which they have been authorized to engage in by the legislature.

It should be pointed out that in 1947 an effort was made to amend article 12, § 5, *supra,* to read as follows:

"No corporation shall hold any real estate for a longer period than 10 years, except such real estate as shall be actually occupied by such corporation in

the exercise of its franchises: Provided, That in cities or villages with populations in excess of 5,000 as determined by the last Federal decennial census or any Federal decennial census thereafter taken, and including an area not exceeding 2 miles distant from the boundary limits of such cities or villages, a corporation may hold any such real estate as shall not be actually occupied in the exercise of its franchises for a period of not to exceed 30 years."

This proposed amendment did not present to the people of our State the same issue which now confronts this Court. The question presented to the voters was whether or not the period of time during which corporations may hold lands in urban areas, not actually occupied by them in the exercise of their franchises, should be extended from 10 to 30 years. The question presented to this Court is entirely different: Does a corporation which has been enfranchised to own, operate and maintain a housing project actually occupy the land necessary for the carrying on of such business within the meaning of the phrase as it is used in the constitutional provision? If the proposed amendment had been adopted, which it was not, the issue in a case such as the present one would have been the same, as it is the interpretation which is to be made of the phrase "actually occupied" which determines whether or not the corporation is limited in its right to hold the real estate in question to the period of time specified in the provision.

How does a corporation occupy real estate? We may take judicial notice of the fact that corporations, in carrying on their affairs, must act through agents and employees, and that in the operation and maintenance of a housing project a corporation must necessarily have such agents and employees upon the premises. In its capacity as landlord, and through its agents and employees, it exercises do-

minion over the premises sufficient, in our opinion, to constitute actual occupancy thereof within the meaning of the constitutional provision.

A decree will be entered in accordance with this opinion but without costs, a public question being involved.

BUSHNELL, C. J., and BOYLES, NORTH, DETHMERS, and CARR, JJ., concurred with BUTZEL, J.